**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF MARYLAND, MARYLAND HIGHER EDUCATION COMMISSION, UNIVERSITY SYSTEM OF MARYLAND BOARD OF REGENTS,<br><br>Defendants. | Case No. 1:26-cv-02796-SAG |

**<u>DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**


INTRODUCTION ..... 1

STANDARD OF REVIEW ..... 2

ARGUMENT ..... 3

I. This Court should grant Defendants' motion to dismiss because the complaint fails to state a claim on which relief may be granted. ..... 3

A. Sections 1621(d) and 1623(a) have no valid preemptive effect. ..... 3

1. Because Section 1623 touches on a traditional area of state authority, the canon of constitutional avoidance supports interpreting its preemptive scope narrowly. ..... 3

2. The United States fails to show how federal laws that limit "eligibility," regulate private individuals, rather than the states that set eligibility rules. ..... 4

B. Federal law does not expressly preempt the challenged Maryland laws. ..... 13

1. Section 1623's plain language does not support the United States' interpretations of the terms "on the basis of residence" and "a U.S. citizen or national." ..... 14

a. The United States misconstrues the "but-for' causation standard. ..... 14

b. The United States improperly seeks to expand the fixed meaning of the term "residence" to incorporate so-called proxies for residence. ..... 15

c. The United States rejects bedrock statutory interpretation principles to argue that the singular "a" means "all." ..... 17

d. The United States disregards Defendants' argument that constitutional avoidance should guide statutory interpretation argument. ..... 18

2. The United States does not address Defendants' argument that the challenged MHEC regulation does not confer eligibility. ..... 20

II. This Court should deny the United States' cross-motion for summary judgment and request for injunctive relief. ..... 21

A. The United States lacks Article III standing because it has not sufficiently alleged injury-in-fact for purposes of its cross-motion for summary judgment. ..... 22

B. The United States has not demonstrated that it meets the requirements for a permanent injunction. ..... 28

1. The United States has not demonstrated irreparable injury. ..... 29

2. The balance of equities and public interest weigh against a permanent injunction. . 29

CONCLUSION ..... 30

# TABLE OF AUTHORITIES

## Cases

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008)........ 23

*American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009)........ 24

*Arizona v. United States*, 567 U.S. 387 (2012)........ 11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........ 2, 3

*Bauer v. Erlich*, 8 F.4th 291 (4th Cir. 2021)........ 6

*Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017)........ 21, 22

*Bond v. United States*, 572 U.S. 844 (2014)........ 14, 15

*Bostock v. Clayton Cty.*, 590 U.S. 644 (2020)........ 14

*Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201 (4th Cir. 2014)........ 28

*City of New York. v. United States*, 179 F.3d 29 (2d. Cir. 1999)........ 5

*Curtis Engine & Equip., Inc. v. Cummins Engine Co.*, No. WMN-97-26, 1997 WL 835051, (D. Md. Oct. 30, 1997)........ 28

*Day v. Bond*, 500 F.3d 1127 (10th Cir. 2007)........ 6

*Dominion Transmission, Inc. v. Town of Myersville Town Council*, 982 F. Supp. 2d 570 (D. Md. 2013)........ 29

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)........ 29

*Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585 (E.D. Va. 2004)........ 10

*Estrella v. Wells Fargo Bank, N.A.*, 497 Fed. Appx. 361 (4th Cir. 2012)........ 26

*Guzman v. Acuarius Night Club LLC*, 167 F.4th 217 (4th Cir. 2026)........ 3

*Haaland v. Brackeen*, 599 U.S. 255 (2023)........ 12

*Hines v. Davidowitz*, 312 U.S. 52 (1941)........ 25

*Hodel v. Virginia Surface Mining & Reclamation Association*, 452 U.S. 264 (1981)........ 8

*Jarvis v. FedEx Off. & Print Servs., Inc.*, 442 F. App'x 71 (4th Cir. 2011)........ 27

*Jarvis v. FedEx Off. & Print Servs., Inc.*, No. 08-1694, 2011 WL 826796 (D. Md. Mar. 7, 2011)........ 27

*KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025)........ 23

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)........ 22

*Maine v. Taylor*, 477 U.S. 131 (1986)........ 24

*Martinez v. Regents of Univ. of California*, 50 Cal. 4th 1277 (Cal. 2010)............................... 6, 15

*Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) ....................................................... 3

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ................................................................................ 24

*Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) ........................................................... 29

*Md. Stadium Auth. v. Ellerbe Becket Inc.,* 407 F.3d 255 (4th Cir. 2005) ........................................ 8

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ...................................................... 28

*Morales v. Trans World Airlines, Inc.* 504 U.S. 374 (1992) .................................................... 5, 7

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) ......................................... passim

*Murthy v. Missouri*, 603 U.S. 43 (2024) ........................................................................................ 20

*New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) ....... 24

*New York v. Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020) ......................................................... 5, 7

*New York v. United States*, 505 U.S. 144 (1992)............................................................................ 12

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) ................................................................................. 18

*Nken v. Holder*, 556 U.S. 418 (2009)............................................................................................... 29

*Plyler v. Doe*, 457 U.S. 202 (1982)................................................................................................... 30

*Pub. Int. Legal Found., Inc. v. Wooten*, 164 F.4th 362 (4th Cir. 2026) .......................................... 25

*South Carolina v. Baker*, 485 U.S. 505 (1988) ........................................................................... 5, 7

*Stephens v. Cty. of Albemarle*, 524 F.3d 485 (4th Cir. 2008) ....................................................... 22

*Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024) ......................................................... 24

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)......................................................................... 22

*United States v. Arizona*, 641 F.3d 339 (9th Cir. 2011).................................................................. 25

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018) ............................................... 5

*United States v. California*, 824 F. Supp. 3d 1079 (C.D. Cal. 2026) ............................... 23, 24, 27

*United States v. City of Boston*, 833 F. Supp. 3d 30 (D. Mass. 2026)..................................... 23, 24

*United States v. Guzman*, 998 F.3d 562 (4th Cir. 2021)...................................................................11

*United States v. Hawaii*, 830 F. Supp. 3d 1028 (D. Haw. 2026).................................................... 26

*United States v. Illinois*, No. 25-cv-1691, 2026 WL 2137256 (S.D. Ill. July 24, 2026)................11

*United States v. Kansas*, No. 5:26-CV-04066-HLT-BGS, 2026 WL 2654069 (D. Kan. Sept. 9, 2026) ......................................................................................................................... 10, 16

*United States v. Texas*, 181 F.4th 548 (5th Cir. 2026) ................................................................... 10

*United States v. Virginia*, No. 3:25-cv-1067, 2026 WL 2984988 (E.D. Va. Oct. 5, 2026) .... passim

*United States v. Walz*, 825 F. Supp. 3d 897 (D. Minn. 2026) ............................................... 10, 18

*Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019) .................................................. 22

*Vlandis v. Kline*, 412 U.S. 441 (1973) ......................................................................................... 6, 9

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000) ........................................ 24

*Wicomico Nursing Home v. Padilla*, 910 F.3d 739 (4th Cir. 2018) ............................................... 3

*Wooten v. Univ. of Maryland, Baltimore*, 733 F. Supp. 3d 402 (D. Md. 2024) ............................ 25

*Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304 (5th Cir. 2023) .................. 20, 21

**Statutes**

***Federal***

8 U.S.C. § 1601 ................................................................................................................ 4, 6, 11

8 U.S.C. § 1601(3) ........................................................................................................................ 6

8 U.S.C. § 1101(a)(33) ................................................................................................................. 16

8 U.S.C. § 1182 ........................................................................................................................... 11

8 U.S.C. § 1182(a) ....................................................................................................................... 11

8 U.S.C. § 1623 ....................................................................................................................... passim

8 U.S.C. § 1623(a) ................................................................................................................... passim

8 U.S.C. § 1621 ....................................................................................................................... passim

8 U.S.C. § 1621(d) ................................................................................................................... passim

***State***

Md. Code Ann., Educ. Code §15-106.8(b) ............................................................................ 13, 15

Va. Code Ann. § 23.1-505.1 ........................................................................................................ 13

**Rules**

Fed. R. Civ. P. 7(b) ..................................................................................................................... 25

Fed. R. Civ. P. 15 (a) ................................................................................................................... 25

Fed. R. Civ. P. 56(a) ..................................................................................................................... 3

**Other**

*Exemption from Nonresident Tuition Pursuant to the Maryland Dream Act*, MHEC (October 2026), https://perma.cc/A3C7-549W. ........................................................................... 19

## INTRODUCTION

The United States fails to build the foundation needed for its claims that federal laws expressly preempt the Maryland Dream Act and other challenged state laws and regulations. For several independent reasons, this Court should grant Defendants' motion to dismiss.

To start, the United States fails to meaningfully address controlling case law showing that the federal laws at issue, to the extent that they purport to preempt state law, violate the Tenth Amendment to the United States Constitution. *See Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018). None of the United States' preemption theories explains how these federal laws, which limit noncitizen eligibility for postsecondary education benefits, regulate private individuals instead of the states that set the eligibility rules for those individuals.

Next, the United States advances a series of statutory-interpretation arguments—unsupported by the statutory text or Supreme Court precedent—to claim that the Maryland Dream Act is expressly preempted. The United States also fails to engage with the argument that the challenged tuition regulation falls outside the preemptive scope of either federal law at issue because the regulation merely reflects a truism—certain noncitizens may be able to establish domicile for purposes of qualifying for in-state tuition—and governing Maryland and federal law. The Eastern District of Virginia's recent decision in *United States v. Virginia*, No. 3:25-cv-1067, 2026 WL 2984988 (E.D. Va. Oct. 5, 2026), is on all fours here and rejects nearly all of these express-preemption arguments. This Court should follow that decision's persuasive reasoning.

The United States' cross-motion for summary judgment also collapses under scrutiny. Although Defendants did not initially move to dismiss for lack of standing, the United States' assertion of "irreparable, sovereign injury" and other related abstract harms underscores that it has also failed to establish Article III injury-in-fact at this stage of the litigation. The failure is stark. Although the Maryland Dream Act has been in effect for nearly fifteen years, the United States has

not identified facts from that time period to show how the United States has been harmed—beyond the existence of purportedly preempted state laws providing for the State's use of its own resources to make its colleges and universities more affordable for certain students.

Further, the United States has not demonstrated that it is entitled to a permanent injunction. It has shown no irreparable injury, and the balance of the equities and the public interest do not weigh in its favor. Enjoining the Maryland Dream Act now would upend a nearly fifteen-year-old tuition framework, imposing immediate hardship on students and families and disrupting Maryland's higher education institutions—all without evidence of apparent harm to the United States beyond the existence of purportedly preempted state laws.

For these reasons, the United States' claims should be dismissed, and, at the very least, because the United States can establish neither the requirements for Article III standing at this stage nor permanent injunctive relief, its cross-motion for summary judgment should be denied.

## STANDARD OF REVIEW

Defendants moved under Rule 12(b)(6) to dismiss the United States' complaint with prejudice. *See* Mem. of Law in Supp. of Defs.' Motion to Dismiss, ECF 8-1 [hereinafter "Defs.' MTD"]. The United States opposed the motion and cross-moved for summary judgment. *See* Pl.'s Opp'n to Defs.' Motion to Dismiss and Cross-Motion for Summ. J., ECF 9 [hereinafter "Pl.'s MSJ"].[1]

"To survive a Rule 12(b)(6) motion, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Bare legal conclusions are not

[1] All page numbers to docket filings refer to original pagination.

entitled to the assumption of truth and are insufficient to state a claim." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679) (internal quotation marks omitted). "Summary judgment may be granted only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 220 (4th Cir. 2024) (quoting Fed. R. Civ. P. 56(a)).

The United States is incorrect that "Maryland does not challenge the sufficiency of factual allegations in the complaint, but rather challenges the legal bases for the claims." Pl.'s MSJ 9 (citing Joint Stip., ECF 15). The joint stipulation states that the "parties . . . agree that Plaintiff's claims in this action present questions of law that do not require discovery and may be resolved at this time on cross-dispositive motions." ECF 15. Consistent with that stipulation, Defendants are entitled to challenge the factual sufficiency of allegations, which presents a question of law. *See Guzman v. Acuarius Night Club LLC*, 167 F.4th 217, 221 (4th Cir. 2026) ("[A] ruling under Rule 12(b)(6) presents a pure question of law [.]") (internal quotation marks omitted).

## ARGUMENT

### I. This Court should grant Defendants' motion to dismiss because the complaint fails to state a claim on which relief may be granted.

#### A. Sections 1621(d) and 1623(a) have no valid preemptive effect.

Applying *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018), Sections 1621 and 1623 are not valid preemption statutes. *See* Defs.' MTD 10 –13, 28.

##### 1. Because Section 1623 touches on a traditional area of state authority, the canon of constitutional avoidance supports interpreting its preemptive scope narrowly.

The United States misunderstand Maryland's position. *See* Pl.'s MSJ 11. Defendants do not dispute that Section 1623 is an exercise of Congress's power to regulate immigration. Defs.' MTD 12 (assuming the federal government's authority). Rather, Defendants argue that this

exercise of immigration authority does not preclude Section 1623 from purporting to *also* (and improperly) regulate in an area of traditional state concern, i.e., higher education. Defs.' MTD 26. Indeed, the congressional purpose behind Section 1623 confirms this point: it advances a policy of "welfare and immigration," not immigration alone. *See* 8 U.S.C. § 1601 (titled "Statements of national policy concerning welfare and immigration") [hereinafter "Statements of National Policy"].

Maryland does not assert "that § 1623(a) is unconstitutional *because* education is a core function of the state's power and should be respected as such," and thus the United States' reliance on *United States v. Illinois*, No. 25-cv-1691, 2026 WL 2137256, at *8 (S.D. Ill. July 24, 2026) (emphasis added), is misplaced. Instead, since Section 1623 reaches an area of traditional state concern, this Court should construe its preemptive scope narrowly to avoid interpreting it as an unconstitutional command to the states in violation of the anticommandeering doctrine. *See* Defs.' MTD 26.

**2. The United States fails to show how federal laws that limit "eligibility," regulate private individuals, rather than the states that set eligibility rules.**

For Sections 1621(d) and 1623(a) to be valid preemption provisions, the United States must show that these statutory provisions regulate individuals and not states. *See Murphy*, 584 U.S. at 479–80. The United States fails to explain how these statutory provisions, which limit "eligibility" for certain public benefits, are not directed at the states which establish such eligibility rules. Defs.' MTD 5–8 (describing Maryland laws and regulations addressing in-state tuition and related financial aid), 11–12 (discussing 8 U.S.C. § 1623), 28 (discussing 8 U.S.C. § 1621). None of the United States' arguments in opposition proves otherwise.

*First*, the United States argues that Section 1623 does not run afoul of *Murphy* because any federal law that preempts a state law "necessarily has the practical effect of telling a State that it

may not do something." Pl.'s MSJ 13, but, even still, the United States does not engage meaningfully with *Murphy*'s explanation that valid preemption provisions "impose restrictions or confer rights on private actors," *see* 584 U.S. at 477. *Murphy* applies this principle to the federal laws at issue in many of the cases the United States cites in defense of the constitutionality of Section 1623. *See* Pl.'s MSJ 13 (citing *Morales v. Trans World Airlines, Inc.* 504 U.S. 374 (1992), *South Carolina v. Baker*, 485 U.S. 505, 514 (1988), and *City of New York. v. United States*, 179 F.3d 29 (2d. Cir. 1999)).[2] Across these cases, *Murphy* explains how federal laws that operate to impose rights or restrictions on private actors have valid preemptive effect, whereas the federal law challenged in *Murphy* did not, and therefore its prohibition on state action violated the anticommandeering doctrine. 584 U.S. at 479–80. *Murphy*'s analysis shows that the federal laws at issue here do not operate as valid preemption provisions.

Instead, Sections 1621(d) and 1623(a) resemble the unlawful anticommandeering provision of the challenged law in *Murphy*—the Professional and Amateur Sports Protection Act ("PASPA"). As relevant here, PAPSA made it "unlawful for a State to sponsor, operate, advertise, promote, license, or authorize by law or compact a lottery, sweepstakes, or other betting, gambling, or wagering scheme based competitive sporting events." *Id.* at 461 (citation and alterations omitted). The Supreme Court concluded that this provision "prohibiting state authorization of sports gambling is not a preemption provision." *Id*. at 480. The provision "certainly does not confer any federal rights on private actors interested in conducting sports gambling operations. []It

[2] Indeed, as one court observed, the Supreme Court's holding in *Murphy* "undercuts portions of the Second Circuit's reasoning [in *City of New York*] and calls its conclusion into question." *United States v. California*, 314 F. Supp. 3d 1077, 1108 (E.D. Cal. 2018). And although the Second Circuit ultimately upheld the constitutionality of the information-sharing provision of the challenged executive order at issue in *City of New York*, it acknowledged that *Murphy* "clarified that prohibitions as well as mandates can manifest impermissible commandeering." *New York v. Dep't of Justice*, 951 F.3d 84, 113 (2d Cir. 2020).

does not give them a federal right to engage in sports gambling.[] Nor does it impose any federal restrictions on private actors. If a private citizen or company started a sports gambling operation, either with or without state authorization, [the challenged provision] would not be violated." *Id.*

By contrast, the federal laws at issue here do not—and could not—grant any "rights" to individuals, and these laws do not "restrict" anyone from applying for or receiving those benefits. *See* Defs.' MTD 12. Neither federal statutory provision confers any "right" on U.S. citizens; they do not grant any nonresident U.S. citizen an entitlement to in-state tuition or related benefits, nor could they. *See Martinez v. Regents of Univ. of California*, 50 Cal. 4th 1277, 1299 (Cal. 2010) (noting that the Supreme Court "has specifically held that states may charge nonresidents, even those who are American citizens, more for attending their public postsecondary institutions than they charge residents") (citing *Vlandis v. Kline*, 412 U.S. 441, 452–453 (1973)). Indeed, courts have held that Sections 1621 and 1623 do not create a private right of action. *See Bauer v. Elrich*, 8 F.4th 291, 295–96 (4th Cir. 2021) (Section 1621); *Day v. Bond*, 500 F.3d 1127, 1138–39 (10th Cir. 2007) (Section 1623).

Nor does either federal statutory provision prohibit undocumented individuals from applying for, or receiving, benefits—though Congress easily could have done so. In fact, Congress expressly recognized that "aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates." 8 U.S.C. § 1601(3). But rather than bar applications for or receipt of these benefits and directly regulate undocumented individuals, Congress instead focused on state-eligibility rules. Section 1621(d) is titled "*State* authority to provide eligibility of illegal aliens for State and local public benefits" and dictates the circumstances under which "[a] *State* may provide" that an undocumented immigrant is "eligible for any State or local public benefit." 8 U.S.C. § 1621(d) (emphasis added). Section 1623(d)

provides that an undocumented immigrant "shall not *be eligible* on the basis of residence within a State" unless a U.S. citizen or national "*is eligible* for such a benefit . . . without regard" to residence. *Id.* § 1623(a) (emphasis added). The United States simply cannot explain how these federal statutory provisions provide "rights" to or impose "restrictions" on—and therefore regulate—any private actors, and language from *New York v. U.S. Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020), concerning different statutory provisions, cannot fill this gap. *See* Pl.'s MSJ 12.

By contrast, as *Murphy* itself explains, the federal laws at issue in the cases on which the United States relies were valid preemption provisions because those laws did regulate private actors. *Morales* involved the Airline Deregulation Act, which lifted prior federal regulations on airlines and barred states from regulating "covered carriers." *See Murphy*, 584 U.S. at 478–79. *Murphy* explained that this statute has valid preemptive effect because it "confers on private entities (i.e., covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.*

*Baker* concerned a federal law that "altered the federal tax treatment of private investments" and "[s]pecifically, removed the federal tax exemption for interest earned on state and local bonds" unless the bonds were issued in registered rather than bearer form. *Murphy*, 584 U.S. at 475–76. *Murphy* explained that this law "did not order the States to enact or maintain any existing laws," but instead "had the indirect effect of pressuring States to increase the rate paid on their bearer bonds in order to make them competitive with other bonds paying taxable interest." *Id.* But even if the removal of the federal tax exemption were viewed as "tantamount to an outright prohibition on the issuance of bearer bonds," the *Murphy* court explained the anticommandeering doctrine still did not apply because "Congress evenhandedly regulates an activity in which both

States and private actors engage"—in that case, the issuance of bonds and the interest they generate. *Id.* But that is not the case here, where states alone set in-state tuition rates.

*Second*, the United States argues that Sections 1621 and 1623 have valid preemptive effect because, rather than operate to directly regulate the states, these provisions instead "give the States a choice" about how to extend eligibility to undocumented immigrants as part of a lawful "cooperative federalism" scheme. Pl.'s MSJ 13; *see also id.* at 25. But this argument fails because it misreads Supreme Court precedent. The cases the United States relies on involve cooperative federalism schemes in which Congress enacts valid preemptive laws as part of a comprehensive federal regulatory program targeting private actors. As part of such a "cooperative federalism" scheme, the federal government gives states a choice about whether—and how—to participate in carrying out the federal program. Sections 1621(d) and 1623(a), however, are not part of any comprehensive federal regulatory program concerning residence-based higher education benefits program, because "[h]igher education is an area of quintessential state concern and a traditional state governmental function." *Md. Stadium Auth. v. Ellerbe Becket Inc.,* 407 F.3d 255, 265 (4th Cir. 2005); *see also* Defs.' MTD 26. As such, any "choice" offered is illusory when viewed in light of the absence of a comprehensive federal regulatory scheme.

The United States cites *Hodel v. Virginia Surface Mining & Reclamation Association*, 452 U.S. 264 (1981) in support of its cooperative federalism theory. In that case, the Supreme Court upheld the constitutionality of the Surface Mining Act, a federal law that "comprehensively regulated surface coal mining." *Murphy*, 584 U.S. at 476. The Supreme Court described the federal law as "a comprehensive statute designed to establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." *Hodel*, 452 U.S. at 268 (internal quotation marks omitted). In distinguishing the lawful preemption

scheme in *Hodel* from the unlawful anticommandeering scheme in *Murphy*, the Supreme Court emphasized in *Murphy* that the statute in *Hodel* did not compel states "to enforce the federal standards, to expend any state funds, or to participate in *the federal regulatory program* in any manner whatsoever." *Murphy*, 584 U.S. at 476 (quoting *Hodel*, 453 U.S. at 288) (alterations omitted) (emphasis added). By contrast, there was no such comprehensive federal regulatory framework governing sports gambling, as *Murphy* recognized that states had different approaches to sports gambling. *See id.* at 462 ("At the time of PASPA's adoption, a few jurisdictions allowed some form of sports gambling."); *see also id.* (noting that "PAPSA contain[ed] 'grandfather' provisions allowing these activities to continue"). The same can be said of in-state tuition benefits.

The United States does not—and cannot—identify any federal regulatory program governing residence-based higher education benefits. Its characterization of Section 1623 as part of "a comprehensive framework regulating alien eligibility for public benefits," Pl.'s MSJ 12, sweeps too broadly for purposes of evaluating whether that statutory provision is a valid preemption provision. Section 1623 is a standalone provision directed solely at residence-based higher education benefits, *see* 8 U.S.C. § 1623 (titled "Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education")—an area in which the federal government historically has not exercised comprehensive regulatory authority. Turning to the public benefit at issue in this matter—in-state tuition status—it is axiomatic that there can be no comprehensive federal regulatory scheme for this public benefit because states, not the federal government, set their own in-state tuition rates and policies. *See Vlandis v. Kline*, 412 U.S. 441, 452–53 (1973) ("[A] State has a legitimate interest in protecting and preserving the quality of its colleges and universities and the right of its own bona fide residents to attend such institutions on a preferential tuition basis."). Because Section 1623 purports to displace conflicting

state law in the abstract, rather than as part of a comprehensive federal regulatory program governing in-state tuition and related higher education benefits, it functions like the unconstitutional prohibition in *Murphy*.

The United States' invocation of *Equal Access Education v. Merten*, 305 F. Supp. 2d 585 (E.D. Va. 2004) does not move the needle. *See* Pl.'s MSJ 13–14. That case is "unhelpful here" because it "dealt with the preemptive implications of § 1623 for a policy promulgated by the Virginia Attorney General to report suspected undocumented students to federal immigration officials"—a "policy [that] is clearly distinct from the" challenged Maryland laws. *United States v. Walz*, 825 F. Supp. 3d 897, 910 (D. Minn. 2026) (citing *Merten*, 305 F. Supp. at 607–08).

*Third*, the United States points this Court to decisions in *United States v. Texas*, 181 F.4th 548 (5th Cir. 2026), *United States v. Illinois*, 2026 WL 2137256 (S.D. Ill. July 24, 2026), and *United States v. Kansas*, 2026 WL 2654069 (D. Kan. Sept. 9, 2026). But as Defendants explained, neither *Texas* nor *Illinois* meaningfully engage with *Murphy*. Defs.' MTD 12 n.9. Neither does *Kansas*. Each of these decisions provides only conclusory statements that Section 1623 concerns "eligibility."[3] But none of the decisions address the question the United States sidesteps—how can federal laws governing "alien eligibility" be directed at the "aliens" themselves, or any other individuals? The short answer is they cannot.

[3] *See Texas*, 181 F.4th at 559–60 (stating that Section 1623(a) "declares a limitation on illegal eligibility itself and does not regulate states directly") (internal quotation marks and alterations omitted); *id.* at 560 ("Section 1623(a)'s self-executing provision 'merely targets offending laws[.]'"); *Illinois*, 2026 WL 2137256, at *7 (Section 1623 "regulates the eligibility of individuals, specifically individuals who are not lawfully present"); *Kansas*, 2026 WL 2654069, at *5 n.8 ("But the plain language of § 1623 regulates private actors, not states. It provides that *an alien* who is not lawfully present in the United States *shall not be eligible* on the basis of residence for certain benefits.") (emphasis in original).

An "alien . . . not lawfully present" cannot make themself eligible for postsecondary benefits any more than they can make themself eligible for admission to the United States. *See* 8 U.S.C. § 1182(a) ("aliens who are inadmissible . . . are ineligible to receive visas and ineligible to be admitted to the United States"); *see also Arizona v. United States*, 567 U.S. 387, 395 (2012) ('Congress has specified categories of aliens who may not be admitted to the United States.") (citing 8 U.S.C. § 1182); *United States v. Guzman*, 998 F.3d 562, 568 (4th Cir. 2021) ("The admission and exclusion of aliens is a sovereign prerogative that is exercised under the Constitution by the political departments."). In this sense, eligibility for postsecondary education benefits (established by the Maryland General Assembly), like eligibility for admission to the United States (established by Congress), is a status conferred by a governmental body—not the individual receiving the benefit. The cases the United States cites do not engage with this reality.

Nor do these cases meaningfully engage with congressional purpose or the broader statutory text that references state and local governments. The congressional purpose behind Section 1623 further confirms that the statutory provision is directed to states. *See* 8 U.S.C. § 1601. The Statements of National Policy explicitly addresses "*State authority* to make determinations concerning the eligibility of qualified aliens for public benefits." *Id.* § 1601(7) (emphasis added). Section 1623 (and Section 1621) appears in Chapter 14, titled "Restricting Welfare and Public Benefits for Aliens," and in Subchapter II, titled "Eligibility for State and Local Public Benefits Programs." State governments "restrict[]" access to public benefits, not "aliens" or U.S. citizens. Thus, it is of no moment that Section 1623 itself "does not mention the states or their legislatures at all," *see* Pl.'s MSJ 12, as the broader statutory text of which it is part does. Because these decisions do not engage meaningfully with the text, purpose, or structure of Section 1623, this Court need not adopt their reasoning.

*Fourth*, the United States argues that, even if Section 1623 regulates states, the Tenth Amendment's anticommandeering limit does not apply because Section 1623 purportedly "applies 'evenhandedly'" to state and private actors. *See* Pl.'s MSJ 12 (quoting *Haaland v. Brackeen*, 599 U.S. 255, 283 (2023)). The United States contends that Section 1623 applies "evenhandedly" because private foundations allegedly offer private scholarships based on residence in Maryland. *Id.* But this argument makes too big of a leap in logic by concluding that Section 1623 applies to those private foundations at all. Even assuming those private foundations offer scholarships to undocumented immigrants based on Maryland residence, and not financial or academic need, the mere fact that they do does not mean that these private foundations are also subject to Section 1623. The United States provides no support whatsoever for its argument that Section 1623—which, to reiterate, resides in the subchapter for "State and local public benefits programs"—applies to private foundations providing private scholarships. The existence of any such private scholarship programs does not excuse Section 1623 from Tenth Amendment anticommandeering limits.

*Fifth*, the United States appears to ask this Court to ignore *Murphy* altogether, as it argues that because Section 1623 was enacted after *New York v. United States*, 505 U.S. 144 (1992), under principles of constitutional avoidance, this Court should resolve any ambiguity in favor of the statute's constitutionality on the theory that "Congress is presumed to know the law." *See* Pl.'s MSJ 16. Though the application of that canon here ultimately may counsel in favor of this Court declining to reach whether the federal laws are valid preemption provisions and instead "dispos[ing] of th[is] case" on "some other ground," *Bond v. United States*, 572 U.S. 844, 855 (2014) (citation omitted)—including that the federal laws do not expressly preempt the challenged state laws, *see infra* Section I.B—the United States' alternative theory is not one this Court should

adopt. Congress surely cannot be presumed to "know the law" that had not yet been decided. If the court considers the federal laws' preemptive effect, then *Murphy* controls here. *See* Defs.' MTD 10–13.

*Finally*, the United States does not engage with Defendants' separate argument that Section 1621(d) violates the anticommandeering doctrine by purporting to dictate the *substance* ("affirmatively provide") and *form* ("enactment of a State law") of state actions providing eligibility for public benefits to certain noncitizens. *See id.* at 28.

In short, none of the United States' arguments addresses let alone undermines Defendants' core position that the challenged federal laws do not regulate private actors at all, but instead purport to regulate the states that establish eligibility rules. *See id.* at 11.

### B. Federal law does not expressly preempt the challenged Maryland laws.

This case is on all fours with the Eastern District of Virginia's recent decision in *United States v. Virginia*, which upheld Virginia's in-state tuition law as not expressly preempted. *United States v. Virginia*, No. 3:25CV1067, 2026 WL 2984988 (E.D. Va. Oct. 5, 2026). The Maryland Dream Act and the challenged Virginia law are nearly identical in all key respects. *Compare* Md. Educ. Ann., Educ. § 15-106.8 (providing that that an individual is eligible to pay the in-state tuition rate if, as relevant here, they (1) attended secondary school in Maryland, (2) graduated from high school or earned the equivalent of a high school diploma, and (3) submit documentation that they or their parent or guardian filed Maryland income tax returns for the two years preceding the academic year in which the tuition exemption would apply), *with* Va. Code Ann. § 23.1-505.1 (providing that that an individual is eligible to pay the in-state tuition rate if, as relevant here, they (1) attended high school in Virginia for at least two years, (2) graduated from secondary school or earned the equivalent of a high school diploma, and (3) submit documentation that they or their

parent or guardian filed Virginia income tax returns for the two years preceding the academic year in which the tuition exemption would apply). As the only decision within the Fourth Circuit to address the novel issues this lawsuit presents—and the only decision in the country to analyze a law nearly identical to the Maryland Dream Act, this Court need look no further than the Eastern District of Virginia's well-reasoned opinion to dispose of nearly all of the statutory-interpretation arguments the United States advances in support of its express-preemption claims here.

**1. Section 1623's plain language does not support the United States' interpretations of the terms "on the basis of residence" and "a U.S. citizen or national."**

Whether the Maryland Dream Act is expressly preempted turns on questions of statutory interpretation of Section 1623's language. On each of those issues, the United States reaches for interpretations that the statutory text cannot bear.

**a. The United States misconstrues the "but-for' causation standard.**

The term "on the basis of" in Section 1623 incorporates a but-for causation standard. *Virginia*, 2026 WL 2984988, at * 9; *see also* Defs.' MTD 15; Pl.'s MSJ 16. Defendants argue that because nonresidents can qualify for in-state tuition under the Maryland Dream Act, residence cannot be a "but-for" cause of eligibility. Defs.' MTD 16–17. The United States rejects that view, arguing that residence is a "but-for" cause of eligibility under the Maryland Dream Act because "'[b]ut-for' causation means that the condition is *a* consideration of the statute, not the *sole* consideration of the statute." Pl.'s MSJ 16 (emphasis in original). But that definition is not in dispute; *Bostock v. v. Clayton County* confirms that "events have multiple but-for causes." 590 U.S. 644, 656 (2020). The flaw is that the United States misapplies the causation standard.

*Bostock* explains that "but-for" causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." 590 U.S. at 656. "In other words, a but-for test directs [courts] to change one thing at a time and see if the outcome changes. If it does,

[that thing is] a but-for cause." *Id.* Eligibility under the Maryland Dream Act is "not based on residence. It is based on high school attendance in [Maryland], graduation from a high school in [Maryland], passage of an equivalency test, or income tax return filings." *See Virginia*, 2026 WL 2984988, at *9. Eligibility is "underinclusive of residency because not all [Maryland] residents will necessarily qualify. If, for example, a [Maryland] resident attends boarding school or private high school in another state for all four years of high school, he or she would not qualify" under the Maryland Dream Act. *See id.* at *9; Md. Code Ann., Educ. Code §15-106.8(b) (requiring that applicant "[a]ttended a public or nonpublic secondary school in the State"). "[I]t is overinclusive of residency because nonresidents can qualify" under the [Maryland Dream Act]. *See Virginia*, 2026 WL 2984988, at *9; Defs.' MTD 16–19. Thus, under a straightforward application of *Bostock*, residence is not a "but-for" cause of eligibility under the Maryland Dream Act because the outcome—eligibility—does not change based on whether someone is a Maryland resident.

**b. The United States improperly seeks to expand the fixed meaning of the term "residence" to incorporate so-called proxies for residence.**

The United States does not appear to dispute that "residence" under 8 U.S.C. § 1623 means a person's "principal, actual dwelling place in fact, without regard to intent," *id.* § 1101(a)(33); *see id.* § 1641(a) (incorporating § 1101(a) definitions). Notwithstanding this straightforward definition, however, the United States argues that eligibility under the Maryland Dream Act is based on residence because the eligibility criteria operate as a "proxy" for residence. *See* Pl.'s MSJ 18–19. But applying the *Virginia* court's discussion of "proxy" here, the Maryland Dream Act's criteria are not a "proxy" for residence "because some nonresidents are eligible under the terms of the statute (and, residents are not all eligible under the statute). That teaches that a student's residence is not the 'but for' cause of eligibility for in-state tuition" under the Maryland Dream Act." *See Virginia*, 2026 WL 2984988, at *10.

Indeed, by describing these requirements as a "proxy" for residence, the United States effectively concedes that eligibility is *not* based on residence. And that matters, because "Congress specifically referred to residence—not some form of surrogate for residence—as the prohibited basis for granting unlawful aliens a postsecondary education benefit." *Martinez*, 50 Cal. 4th at 1291 (Cal. 2010); *see also Kansas*, 2026 WL 2654069, at *4 n.7 (describing "the question of proxy [for residence]" as a "red herring" because the plain language of the challenged state law "dictat[ed] the answer in [that] case") (internal quotation marks omitted).

***

Nonresidents can satisfy each of the Maryland Dream Act eligibility requirements. *See* Defs.' MTD 16–19. The United States does not seriously dispute this point. It recognizes that a student who attends a private school in Maryland need not be a Maryland resident, *see* Pl.'s MSJ 18, and that non-residents can file non-resident income tax returns, *id.* at 19. Indeed, the United States' strategically qualified descriptions of each of the Maryland Dream Act's requirements confirms that residents are not the only individuals who meet the law's eligibility requirements.[4]

Thus, given the concessions implicit in the United States' characterizations of the Maryland Dream Act requirements, it should not be disputed—under a correct understanding of but-for causation—that residence is a not a but-for cause of eligibility under the Maryland Dream Act. Because the Maryland Dream Act "does not provide in-state tuition 'on the basis of residence,' Section 1623(a) does not operate to preempt it." *Virginia*, 2026 WL 2984988, at *11.

[4] *See* Pl.'s MSJ 18 ("*generally speaking*, attending a public high school in Maryland requires a student to be domiciled with a parent or legal guardian in Maryland") (emphasis added); *id.* ("[a]nyone who satisfies [the Dream Act requirement] by relying on public high school attendance and graduation is *almost certainly* a Maryland resident") (emphasis added); *id.* ("the filing of a Maryland tax return is, *in many instances*, based on residence") (emphasis added); *id.* at 19 ("the *majority* of people filing Maryland income tax returns reside in Maryland") (emphasis added).

#### c. The United States rejects bedrock statutory interpretation principles to argue that the singular "a" means "all."

Grounded in Section 1623's plain language, Defendants argue that "a" U.S. citizen cannot be read to mean "all" U.S. citizens. Defs.' MTD 24–25. The United States, however, stretches statutory interpretation beyond reasonable limit, leveraging the uncontroversial point that "a" can mean "one or more," *Virginia*, 2026 WL 2984988, at *11, for the untenable claim that it must therefore mean "all." *See* Pl.'s MSJ 23.

To start, the United States acknowledge that Section 1623 uses "parallel language," Pl.'s MSJ 23, "*an* alien . . . shall not be eligible on the basis of residence" unless "*a* citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident," 8 U.S.C. § 1623(a). But despite this "parallel language," the United States insists "[t]here is nothing in the statute to suggest Congress meant just a single alien or a single citizen[.]" Pl.'s MSJ 23. This ignores Supreme Court precedent regarding the Dictionary Act, which explains that the use of the word "a" *can mean* "one or more." *See Niz-Chavez v. Garland*, 593 U.S. 155, 164 (2021) ("The Dictionary Act [1 U.S.C. § 1] does not transform every use of the singular 'a' into the plural 'several.' Instead, it tells us only that a statute using the singular 'a' can apply to multiple persons, parties, or things."). Setting aside the question of how many people the word "a" can sustain, Section 1623's repeated use of the singular "a" and "the," at bottom, does not require a state to make *all* nonresident U.S. citizens eligible in order for a law to survive purported preemption. *Virginia*, 2026 WL 2984988, at *11.

Lacking a in foothold in statutory text, the United States turns to congressional purpose, arguing that Defendants' interpretation of Section 1623 "would abrogate the entire purpose of the statute," Pl.'s MSJ 23, which the United States contends is to "eliminate the [in-state tuition] incentive for illegal aliens to come to the United States," *id.* at 24. But a "'purposive argument

simply cannot overcome the force of the plain text.' The statute's language controls. The language does not say 'all citizens.'" *Virginia*, No. 3:25CV1067, 2026 WL 2984988, at *12 (citing *Bowe v. United States*, 607 U.S. 13, 41 (2026)).

Finally, the United States asks this Court to follow cases that adopt its flawed reading of Section 1623 that the phrase "a" U.S. citizen mean "all" U.S. citizens. *See* Pl.'s MSJ 23 (citing cases). But this Court need not (and should not) rely on those decisions, discussed above. Instead, the Court should follow the other decisions that engage directly with the statutory text and controlling precedent, such as *Virginia*, 2026 WL 2984988, at *11 ("The parallel structure of the statute ('an alien ... a citizen or national') plainly indicates the meaning. 8 U.S.C. § 1623(a).") and *Walz*, 825 F. Supp. 3d at 911 ("Based on the text and precedent, the use of 'a' in § 1623 means 'one' or 'any.'").

**d. The United States disregards Defendants' argument that constitutional avoidance should guide statutory interpretation argument.**

The United States overlooks Defendants' Tenth Amendment concerns about unconstitutional commandeering, stating only that its interpretation of Section 1623 "does not shift the cost of regulations . . . it gives states a choice in how they choose to structure their tuition benefits[.]" Pl.'s MSJ 24. But Defendants raise Tenth Amendment concerns not only as a constitutional argument, but also as a tool of statutory interpretation. Defs.' MTD 26. Principles of constitutional avoidance suggest that this Court should reject the federal government's expansive interpretation of Section 1623—that no undocumented immigrant shall be eligible for in-state tuition unless *all* U.S. citizens and nationals are—and should instead read the statute narrowly—that no undocumented immigrant shall be eligible for in-state tuition unless *some* U.S. citizens and nationals are—to prevent federal law from becoming an unconstitutional directive to

the states. *See Bond*, 572 U.S. at 855. This approach aligns with the United States' interest in preserving the constitutionality of its law. *See* Pl.'s MSJ 16 (raising constitutional avoidance).

***

Nonresident U.S. citizens are eligible for these postsecondary education benefits—both as a matter of law. *See* Defs.' MTD 20–24 (discussing nonresident U.S.-citizen eligibility for in-state tuition under the Maryland Dream Act and other Maryland laws); *see also Exemption from Nonresident Tuition Pursuant to the Maryland Dream Act*, MHEC (October 2026), https://perma.cc/A3C7-549W (nothing that, between Summer 2025 and Spring 2026, nonresident U.S. citizens saved approximately $1,600,800 in tuition costs under the Maryland Dream Act).

Thus, given such nonresident U.S. citizen eligibility, it should not be disputed—under a correct understanding of the term "a citizen"—that the Maryland Dream Act satisfies the second prong of Section 1623(a), that a U.S. citizen or national be eligible for the same benefit "without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a).[5] "Thus, even if the [Maryland Dream Act] somehow could be found to fall within the first clause of Section 1623(a) [eligibility is 'on the basis of residence'], the [Maryland Dream Act] falls within the exception from preemption provided by Section 1623(a)'s second clause." *See Virginia*, 2026 WL 2984988, at *14. For this second, independent reason, the Maryland Dream Act is not expressly preempted.

[5] The United States also suggests that individuals who attended and graduated from Maryland high schools and later moved out of the State are eligible for in-state tuition under the Maryland Dream Act "on the basis of" their prior Maryland residence. Pl.'s MSJ 21 n.10. Even if that were correct, there are other ways nonresidents can satisfy the high-school attendance and graduation requirements. *See* Defs.' MTD 16.

**2. The United States does not address Defendants' argument that the challenged MHEC regulation does not confer eligibility.**

The United States wholly fails to engage with Defendants' argument that the challenged provision of the MHEC regulation merely reflects the truism that a noncitizen may be able to establish domicile under Maryland law. Defs.' MTD 28–29. Rather, the United States simply declares that the MHEC regulation "require[s] community colleges to set differing tuition rates based on residence in Maryland, and to award such rates to aliens not lawfully present." *See* Pl.'s MSJ 20; *see also id.* at 22 (MHEC regulation "mandates that aliens not lawfully present must be eligible for in-state tuition"). But the United States cannot establish the necessary causal link between the MHEC regulation requiring that a community college set different tuition rates and the challenged regulation *itself* mandating that an undocumented individual be made eligible for any specific tuition rate because, as Defendants previously explained, the MHEC regulation "leaves room for additional determinations before eligibility for such status is established." Defs.' MTD 3; *see also cf. Murthy v. Missouri*, 603 U.S. 43, 57–58, 74 (2024) (reaffirming "bedrock principle" that "a federal court cannot redress injury that results from the independent action of some third party not before the court"). And they cannot establish this link because the regulation does not, by its express terms, confer eligibility on anyone.

The United States also does not address Defendants' explanation that the challenged provision also reflects existing Maryland and federal law recognizing that because certain noncitizens may be able to establish domicile, higher-education institutions cannot categorically bar these noncitizens on the basis of immigration status from potentially qualifying for in-state tuition. The United States does not cite the binding case law Defendants reference, *see* Defs.' MTD 29, let alone distinguish or rebut it.

Finally, the United States' attempt to dismiss Defendants' reliance on *Young Conservatives of Texas Foundation v. Smatresk*, 73 F.4th 304 (5th Cir. 2023), as irrelevant, *see* Pls.' MSJ 20–21; Defs.' MTD 30, fails for the reasons provided in *Virginia*. As the *Virginia* court wrote, "the United States ignores the context in which" Maryland "cites *Young Conservatives*. The key point is that a [state] statute which is silent about eligibility based on immigration status is not preempted by Section 1623(a)." *Virginia*, 2026 WL 2984988, at *8. Thus, the *Young Conservatives* "principle that Section 1623(a) has 'nothing to say about' a [state] law like that" applies with equal force to the MHEC regulation which itself "does not take a stance on whether illegal aliens are eligible for a cheaper price." *See id.* (citing *Young Conservatives*, 73 F.4th at 313). That same principle applies to Section 1621(d), whose "sole focus," like Section 1623(a)'s, is "on improper benefits for illegal aliens" and therefore also has "nothing to say" about MHEC's regulation. *See Young Conservatives*, 73 F.4th at 313.

Because the challenged MHEC regulation does not by its express terms make any undocumented immigrant eligible for postsecondary education benefits, it is not expressly preempted by Sections 1623(a) or 1621(d), and these claims should be dismissed. Defs.' MTD 27–30.

## II. This Court should deny the United States' cross-motion for summary judgment and request for injunctive relief.

The United States attempts to bootstrap its theory of harm onto its theory of liability—asserting that the alleged Supremacy Clause violation itself constitutes irreparable, sovereign injury for purposes of securing a permanent injunction. *See* Defs. MSJ 3. That theory of harm is insufficient to support its request for a permanent injunction, and it also underscores that the United States has not alleged an injury-in-fact at this summary-judgment stage.

### A. The United States lacks Article III standing because it has not sufficiently alleged injury-in-fact for purposes of its cross-motion for summary judgment.

Although Defendants did not originally move to dismiss under Rule 12(b)(1) for lack of standing, the United States' memorandum in support of summary judgment illustrates why it cannot establish standing and this Court lacks jurisdiction. "[T]he procedural posture of the case dictates the plaintiff's burden as to standing," *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017), such that a plaintiff "must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation,'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430 (2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim." *Beck*, 848 F.3d at 270 (quoting *Lujan*, 504 U.S. at 561) (internal quotation marks omitted). At the summary-judgment stage, however, a plaintiff "can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Stephens v. Cty. of Albemarle*, 524 F.3d 485, 491 (4th Cir. 2008) (quoting *Lujan*, 504 U.S. at 561) (internal quotation marks and alternation omitted). "Standing is a threshold requirement for jurisdiction that may be raised at any time," *Pub. Int. Legal Found., Inc. v. Wooten*, 164 F.4th 362, 365 (4th Cir. 2026), and "[a]s a jurisdictional requirement, [it] cannot be waived or forfeited," *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662–63 (2019). Considering the United States' description of irreparable injury in its summary-judgment brief, the record fails to show injury-in-fact at the summary-judgment stage, and the United States therefore lacks standing.

The United States lacks standing because it alleges no concrete and particularized injury. Injury-in-fact requires the "invasion of a legally protected interest" that is "concrete and

particularized" and "actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). The United States' principal theory of harm is that Maryland law is preempted by federal law and that the federal government is injured by this asserted Supremacy Clause violation. Compl. ¶¶ 64–84 (claims for relief based on Supremacy Clause violation). It further claims that it has suffered "irreparable injury" because the challenged laws (1) have caused "sovereign injury," (2) "frustrate" and "impede" federal immigration law and policy, and (3) absent an injunction, will spur other states to enact similar measures. Pl.'s MSJ 3, 25–27. None of these theories establishes Article III injury-in-fact, let alone injury sufficient to warrant a permanent injunction. *See* Section II.B.1 (discussing irreparable injury for permanent injunction).

*First*, the United States has not established sovereign injury. Here, the United States declares that Maryland "seeks to upset th[e] [federalist] constitutional order by establishing its own immigration policy via state laws" and that this "blatant challenge to the Constitution and the bedrock principles of Federalism . . . causes irreparable harm to the United States." Pl.'s MSJ 26.

It is true that the federal government, like the States, may assert an "injury to its sovereignty arising from violation of its laws." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). But if a federal law validly preempts state law because it regulates private actors rather than states, *see Murphy*, 584 U.S. at 479, then "state laws that conflict with federal law are 'without effect,'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)), and the federal government is free to enforce its "Supreme" law. Thus, the mere *existence* of a preempted state law, without more, does not constitute an injury *per se* to the United States. *See United States v. California*, 824 F. Supp. 3d 1079, 1084–86 (C.D. Cal. 2026) (noting theory that "mere *existence* of a preempted state law creates a sovereign injury to the

federal government" is not supported by binding authority) (emphasis in original); *United States v. City of Boston*, 833 F. Supp. 3d 30, 45 (D. Mass. 2026) (rejecting the federal government's contention that it "suffers a 'sovereign harm' from the *existence* of an allegedly preempted local ordinance (separate from any concrete harm from the ordinance's *enforcement*), and that this harm 'can substitute as a traditional injury in fact'") (emphasis in original) (citation omitted).

This is not to say that the United States can never establish Article III injury-in-fact based on the alleged federal preemption of state law. Rather, the United States must articulate concrete harm beyond the *mere existence* of a preempted state law that is "without effect."[6] *California*, 824 F. Supp. 3d at 1083–84 ("Perhaps [a state's] *enforcement* of the subject laws and regulations could give rise to an injury in fact by impeding the operations or functions of the federal government, but [the United States] neither pleads nor presents such a theory.") (emphasis in original).

Otherwise, the implications of such unsupported—and therefore "limitless"—theories of sovereign harm are "sweeping." *Boston,* 833 F. Supp. 3d at 45 (suggesting that the United States' theory—under which its asserted sovereign injury would extend to even a nonbinding city-council resolution expressing disagreement with federal immigration policy—would allow federal suits against any state or local pronouncement contrary to federal policy). Although the United States may object in the abstract to a state's enactment of a conflicting law, such disagreement alone does not constitute a concrete and particularized harm.

[6] States, by contrast, have "a sovereign interest to sue the United States" whenever "a federal regulation purports to preempt state law" because the federal law overrides state law, and "a State clearly has a legitimate interest in the continued enforceability of its own statutes." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 591 (6th Cir. 2024) (quoting *Maine v. Taylor*, 477 U.S. 131, 137 (1986)). That harm is concrete: the state cannot enforce its own statutes. No such harm exists here.

None of the four cases the United States cites supports its preemption-based theory of sovereign injury to the federal government. Indeed, two cases do not even involve the United States as a plaintiff, but rather private actors. *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) involved preemption claims brought by a private trucking association. *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) involved preemption claims raised by a utility operator. That case did not even address whether the challenged state action was preempted by federal law, but rather whether a federal district court properly exercised abstention doctrines in declining jurisdiction over a preemption claim, *id.* at 352–53, and therefore does not apply here.

The United States cites only two cases in which the United States itself was the party allegedly injured. But rather than show that federal preemption is an injury *per se* to the United States, these cases show that courts have found irreparable harm in cases that involve intergovernmental-immunity, obstacle-preemption, and field-preemption claims, which, by their nature, often require courts to assess *how* challenged state laws impact the federal government, not merely whether the laws conflict with the plain language of a federal statute. *See United States v. Arizona*, 641 F.3d 339, 352–53, 356, 360, 365 (9th Cir. 2011) (finding that various state laws interfered with and posed an obstacle to congressional purposes and objectives); *California*, 173 F.4th at 1068 (finding a likely constitutional violation because the state law "attempts to directly regulate the United States").

*Second*, the United States' claim that "the challenged laws frustrate . . . federal immigration laws and policies," Pl.'s MSJ 26, is a legal conclusion unsupported by factual allegations.[7] The United States does not describe how the challenged laws, which address state public higher education, operate in practice to harm the federal government. *United States v. Hawaii*, 830 F. Supp. 3d 1028 (D. Haw. 2026) is instructive. There, the United States argued that its sovereignty would be injured if Hawaii pursued tort claims against private fossil-fuel companies because those claims would be preempted by federal law. *Id.* at 1040. The court noted that the United States did not identify how it would be actually harmed; it did not, for example, identify "any lessee that would avoid entering any oil or gas lease, any foreign nation that would alter its relations with the United States, or any EPA regulation that would be undermined if the State prevails." *Id.* The court ultimately rejected the United States' sovereign-injury theory, concluding that its injury-in-fact allegations were "merely legal conclusions" and did not describe any concrete harm.

[7] This claim also appears to introduce a new merits theory—namely, that the challenged Maryland laws are obstacle preempted, which occurs when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 684 (D. Md. 2025) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Plaintiffs did not plead obstacle preemption, *see* Compl. ¶¶ 64–84 (pleading express-preemption claims only), and to the extent they seek to amend their complaint through briefing, this Court should reject those improperly raised arguments. *See Wooten v. Univ. of Maryland, Baltimore*, 733 F. Supp. 3d 402, 414 (D. Md. 2024) ("It is well settled that a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing."). Relatedly, this Court should deny the United States' request for leave to amend its complaint, *see* Pl.'s MSJ 9 n. 7, because the request was raised improperly in a footnote in its reply and opposition brief. A request for leave to amend must be made by motion. *See* Fed. R. Civ. P. 7(b) (a request for a court order must be made by motion), 15(a) (amendments made out of time require the opposing party's written consent or the court's leave). The United States did not seek Defendants' written consent, and "where, as here, the plaintiff fails to formally move to amend and fails to provide the district court with any proposed amended complaint or other indication of the amendments [it] wishes to make, the district court [does] not abuse its discretion" in denying leave to amend. *Estrella v. Wells Fargo Bank, N.A.*, 497 Fed. Appx. 361, 362 (4th Cir. 2012) (per curiam) (second alteration in original) (quotation marks omitted). Thus, this Court should deny this request for leave to amend for failure to meet these requirements.

*Id.* So too here. Defendants have implemented the challenged laws for several years, and yet the United States does not identify a single fact to show that these laws have in fact undermined immigrant self-sufficiency or encouraged illegal immigration.[8] Instead, the United States asserts that the challenged laws violate the express terms of federal law and, ipso facto, violate congressional purpose. *See* Pl.'s MSJ 26–27. Such "undisguised legal conclusions in search of substantiating facts," *California*, 824 F. Supp. 3d at 1083, cannot establish injury-in-fact.

*Third*, the United States asserts—again without any factual support—that failing to enjoin the challenged laws "will invite other States to enact their own laws." *See* Pl.'s MSJ 27. But this claim ignores that over two dozen states already provide or, until recently, have provided in-state tuition to certain qualified undocumented immigrants, as reflected in the breadth of the United States' own lawsuits challenging these laws. *See id.* at 27 n.11 (citing U.S. Department of Justice press release from September 10, 2026, stating that the "Department has now challenged every state with laws that provide in-state tuition to illegal aliens, bringing the number of lawsuits to 25"). It is therefore implausible that the continued implementation of longstanding Maryland laws would spur other states to adopt similar ones, especially when the United States already sued every state whose laws it finds objectionable. Put another way, the states inclined to enact such laws

[8] Indeed, the only facts the United States identifies are that undocumented immigrants have enrolled in Maryland colleges and universities, qualified for in-state tuition under the Maryland Dream Act, and saved nearly nine million dollars in tuition costs between Summer 2024 and Spring 2025. *See* Pl.'s MSJ 8–9 (citing Sanjay Rai, *Exemptions from Nonresident Tuition for Qualified Children of Undocumented Immigrants*, MHEC (July 2025), https://perma.cc/5TFD-NAP9); *see also* Compl. ¶¶ 4–5. But it is worth noting that the United States does not object to states providing in-state tuition to undocumented immigrants as a general manner. *See* Pl.'s MSJ 28. Thus, even these factual allegations repackage the United States' merits arguments that the Maryland Dream Act conflicts with federal law because they purportedly provide eligibility for in-state tuition and related benefits in a manner inconsistent with the express terms of federal law. *See id.* at 26–27.

have already done so, and the states that have declined to do so for decades are unlikely to change course now, regardless of the outcome of this case.

In sum, the United States has not met its heightened evidentiary burden to establish injury-in-fact at this summary-judgment stage. Indeed, the United States' summary-judgment briefing on irreparable injury casts doubt on whether its complaint even plausibly alleges injury-in-fact. This Court should therefore deny the United States' cross-motion for summary judgment and dismiss the case for lack of subject-matter jurisdiction. *See Jarvis v. FedEx Off. & Print Servs., Inc.*, No. 08-1694, 2011 WL 826796, at *9 n.6 (D. Md. Mar. 7, 2011), *aff'd*, 442 F. App'x 71 (4th Cir. 2011) ("Because the court finds that Plaintiff lacks standing, his cross-motion for summary judgment . . . will be denied as moot."). But even assuming the United States has pleaded sufficient factual allegations to establish injury-in-fact at the motion-to-dismiss stage, and this Court does not dismiss the case for any other reason, it should still not grant the United States' cross-motion for summary judgment and instead allow for limited jurisdictional discovery on standing. *Cf. Curtis Engine & Equip., Inc. v. Cummins Engine Co.*, No. WMN-97-26, 1997 WL 835051, at *4 (D. Md. Oct. 30, 1997) (denying Defendant's motion to dismiss and Plaintiff's motion for partial summary judgment to allow time for discovery on issues related to personal jurisdiction).

### B. The United States has not demonstrated that it meets the requirements for a permanent injunction.

In its motion for summary judgment, the United States also seeks a permanent injunction, *see* Pl.'s MSJ 3, 29, but a permanent injunction is a "drastic and extraordinary" relief, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 207 (4th Cir. 2014) ("A court should not impose an injunction lightly, as it is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.") (internal quotation marks

omitted). "Because Plaintiffs seek a permanent injunction, they must first demonstrate 'actual success' on the merits[.]" *Mayor of Baltimore v. Azar*, 973 F.3d 258, 274 (4th Cir. 2020). Putting aside that the United States' claims fail on the merits, *see supra* Sections I–II, their request for a permanent injunction should be denied.

Even assuming success on the merits, it does not follow automatically that the United States is entitled to a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (permanent injunction factors). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" *Id*.

**1. The United States has not demonstrated irreparable injury.**

Success on the merits does not relieve a plaintiff of their obligation to show irreparable injury. *See Dominion Transmission, Inc. v. Town of Myersville Town Council*, 982 F. Supp. 2d 570, 580 (D. Md. 2013) (denying request for a permanent injunction because "there has been no showing of irreparable injury at this time"). Even if the United States prevails on its express-preemption claims, which it should not, it still has not shown any injury, let alone irreparable injury. *See supra* Section III.A (discussing injury-in-fact for Article III standing). That failure is fatal to the United States' request for a permanent injunction.

**2. The balance of equities and public interest weigh against a permanent injunction.**

The public interest does not support a permanent injunction.[9] The United States ignores the real-world impact of enjoining the Maryland Dream Act, which has been in effect for nearly fifteen years. Maryland's public institutions of higher education have developed policies and practices around the Maryland Dream Act, and students and families have relied on it in planning

[9] The balance of the equities and public interest factors "merge" when, as here, the Government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

for college. An injunction would immediately disrupt those programs. It would force current students who pay the reduced tuition rate and receive financial aid on that basis to find new ways to pay for college or leave school. It would also disrupt the plans of students who intend to apply for this reduced tuition rate and related financial aid, requiring them to reevaluate or even to abandon their plans to attend college entirely. The United States' suggestion that Marylanders address concerns about federal immigration policy with their federal congressional representatives or enact new state legislation that conforms to the federal government's preferred eligibility criteria, *see id.*, ignores the immediate harm a permanent injunction would cause in the meantime.

The United States also overlooks the long-term economic and social harm the State would likely face if Dream-Act-qualified undocumented students lose access to affordable higher education. That harm is precisely what the Supreme Court warned against: the creation of a "permanent caste" of undocumented individuals "encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents." *Plyler v. Doe*, 457 U.S. 202, 219 (1982). Enjoining the Maryland Dream Act would upend a comprehensive educational framework and impose significant hardship on undocumented students and their families who depend on in-state tuition to access higher education. Given the United States has not articulated any harm beyond alleged preemption, the public interest strongly weighs against granting an injunction.

## CONCLUSION

For the foregoing reasons, this Court should deny the United States' cross-motion for summary judgment and grant Defendants' motion to dismiss the United States' claims with prejudice.

Dated: October 8, 2026 | Respectfully submitted,

**ANTHONY G. BROWN**

ATTORNEY GENERAL OF MARYLAND

/s/ Yasmin Dagne

Yasmin Dagne (D. Md. Bar No. 32016)
Adam Kirschner (D. Md. Bar No. 31767)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
ydagne@oag.maryland.gov
410-223-1580

*Counsel for Defendants*